UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL THOMAS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 15 C 7187 ) |
| DR. S. OBAISI; DR. A. MARTIJA; and WEXFORD HEALTH SOURCES, INC., | ) Judge Rebecca R. Pallmeyer ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael Thomas has been an inmate at Stateville Correctional Center ("Stateville") since May 2011. In this lawsuit, Thomas alleges that two doctors—Drs. Saleh Obaisi[1] and Alma Martija[2]—were deliberately indifferent to two of his medical needs—hand pain and a prostate problem. The court recruited counsel to represent Thomas, and the parties have engaged in discovery. The record shows that during the course of Thomas's incarceration at Stateville, he has seen multiple doctors and healthcare professionals for a variety of conditions. The court had previously dismissed Plaintiff's *respondeat superior* allegations against Obaisi and Martija's employer, Wexford Health Systems, Inc. ("Wexford"), which provides healthcare services to inmates at Stateville [33].[3] What remains of Thomas's First Amended Complaint [23] are Thomas's claims against Obaisi and Martija and a *Monell* claim against Wexford for

---

[1] Dr. Obaisi, now deceased, "was a physician and Medical Director at Stateville Correctional Center from November 2013, until his death on December 23, 2017." (Pl.'s Resp. to Dfs.' SOF [99] ¶ 2.)

[2] Dr. Martija is "licensed as a physician and Illinois and served in [that] capacity at Stateville Correctional Center from July 2014 to July 2016." (Martija Decl., Ex. D to Dfs.' SOF [84-4] ¶ 2.)

[3] The court notes that there is an open question in this Circuit about whether private corporations such as Wexford are subject to *respondeat superior* liability. *See Norwood v. Ghosh*, 723 F. App'x 357, 360–61 (7th Cir. 2018), *as amended* (Feb. 16, 2018); *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017); *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 790–96 (7th Cir. 2014); *Pindak v. Dart*, 125 F. Supp. 3d 720, 764–65 (N.D. Ill. 2015).

maintaining an unconstitutional policy or practice of deliberate indifference to his medical needs, in violation of the Eighth Amendment. (First Am. Compl. [23] ¶ 45.) Defendants now move for summary judgment [83]. That motion is granted.

## BACKGROUND

### I. Thomas's Hand Injury

Thomas injured his hand at Hill Correctional Center ("Hill") on March 22, 2011 during a fight with another inmate. (Thomas Dep., Ex. F to Dfs.' SOF ("Thomas Dep.") [85-2], at 32:15–16.) Medical records dated March 24, 2011 show that Thomas's hand was x-rayed that day, and a March 29 notation states "Fx R hand (to be casted)."[4] (Stateville Med. Record, Ex. E to Dfs.' SOF ("Stateville Med. Record") [85], at Bates No. 20.) Thomas's hand was put in a splint.[5] (Pl.'s 56.1 Statement of Facts ("Pl.'s SOF") [100] ¶ 2; Dfs.' 56.1 Statement of Facts ("Dfs.' SOF") [84] ¶ 26. *See* Stateville Med. Record [85], at Bates Nos. 22–23 (noting a splint on Thomas's hand on both 3/30/11 and 4/22/11).) A May 9 x-ray of Thomas's hand revealed that "[i]nterval further healing ha[d] taken place," but that Thomas's fourth and fifth metacarpals were "foreshortened." (Stateville Med. Record [85], at Bates Nos. 27, 92.)

Shortly thereafter, on May 11, Thomas was transferred from Hill to Stateville. With Thomas's consent, the splint was removed before he left Hill. (Dfs.' SOF [84] ¶ 29; Pl.'s SOF [100] ¶ 3; Thomas Dep. [85-2], at 39:12–23). He understood that he would get a new cast when he got to Stateville. (Thomas Dep. [85-2], at 39:15–19.) In fact, however, his hand was never re-splinted or casted there, despite the fact that he told Stateville medical personnel "that his hand was to be recasted." (Pl.'s SOF [100] ¶ 6; Dfs.' Resp. to Pl.'s SOF [102] ¶ 7.) On July 26, 2011,

---

[4] The court takes judicial notice that Fx is an abbreviation for fracture. *Fx*, STEDMAN'S MED. DICT., Westlaw (database updated Nov. 2014).

[5] Thomas sometimes refers to this splint as a cast. (*See* Thomas Dep. [85-2], at 37:13 (stating that an individual named Dr. Soba "half casted up" the hand).) This dispute is immaterial to this analysis, however; Thomas's healthcare at Hill is not at issue.

a physician assistant[6] ("PA") at Stateville saw Plaintiff Thomas. The notes from that visit state than an "x-ray dated 5/10/1 [sic] [was] reviewed, no further treatment needed." (Stateville Med. Record [85], at Bates No. 40.) The PA did note that Thomas had "some [illegible] discomfort," and that he had told her "I know its [sic] still broken," but the PA did not prescribe any follow-up measures. (*Id.*)

Between 2011 and the filing of this lawsuit, Thomas has had several x-rays on his right hand, and they all showed similar results: healed fractures of his fourth and fifth metacarpals, with remaining deformities or shortening in metacarpals four and five.[7] (*See* Pl.'s SOF [100] ¶ 8 (Aug. 26, 2011 x-ray); *id.* at ¶ 10 (Nov. 12, 2015 x-ray); Dfs.' SOF [84] ¶ 33 (Aug. 27, 2012 x-ray findings).) After his August 2012 x-rays, Thomas was evaluated by an unidentified individual for physical therapy.[8] The record from that appointment noted that Thomas was "very reluctant to make fist" and that his pain was "8/10 at times." (Stateville Med. Record [85], at Bates No. 131.) It is unclear whether therapy began that day, but the chart notes subsequent therapy appointments. A record from December 18, 2012, for example, states that Thomas was "doing good" with his physical therapy and was "close to DIC." Defendants interpret this to mean he was close to being discharged from physical therapy, but Plaintiff claims he "cannot read the medical handwriting on this document." (Pl.'s Resp. to Dfs.' SOF [99] ¶ 35.) Plaintiff does not deny that he attended physical therapy during these dates.

---

[6] The record note is made by a "PA." The court takes judicial notice that PA is an abbreviation for physician assistant. *PA*, STEDMAN'S MED. DICT., Westlaw (database updated Nov. 2014).

[7] At least one x-ray also noted a healed facture in the second metacarpal. (Dfs.' Resp. to Dfs.' SOF [102] ¶ 8.)

[8] The medical notes a "PT eval." (Stateville Med. Record [85], at Bates No. 131.) The court notes that PT is an abbreviation for physical therapy or physical therapist. *PT*, STEDMAN'S MED. DICT., Westlaw (database updated Nov. 2014).

Thomas explained in his deposition, without citing to specific dates, that he discussed his hand pain with both Drs. Obaisi and Martija. (Thomas Dep. [85-2], at 41:14–42:3.) Obaisi began working at Stateville in late 2013, and Martija started there in 2014. (Dfs.' SOF [84] ¶ 2; Martija Decl., Ex. D to Dfs.' SOF [84-4] ¶ 2.) When asked how Dr. Martija responded to his concerns, Thomas recalled that "[s]he ain't really say nothin. I think she just wrote [sic] and the next thing I got was some pain pills." (*Id.* at 42:16–18.)

On October 27, 2014, Thomas filed a grievance against the Stateville "health care unit" regarding his hand.[9] (Offender's Grievance, in Master File, Ex. A to Dfs.' SOF ("Master File") [84-1], at Bates No. 229.) Under "nature of grievance," Thomas checked both the "staff conduct" and "medical treatment" checkboxes, but he named no particular Wexford employees. (*Id.*) He noted three health problems for which he believed he had received inadequate healthcare: his "prostate problem" (discussed below), "bleeding in stool,"[10] and his hand. (*Id.*) Regarding his hand, he wrote, "My had was broke. It steel broke it was like that when I come down [?]-11-11." (*Id.*) Under the "relief requested" portion of the grievance, Thomas wrote, "I just want you to get me a bone doctor so they can look at my hand." (*Id.*) The Grievance Counselor's response on

---

[9] Thomas has filed several grievances about his healthcare during his time at Stateville, but he only included two grievances—one from October 27, 2014, and one from January 12, 2015—as part of this lawsuit. (*See* Thomas Dep., Ex. F to Dfs.' SOF ("Thomas Dep.") [85-2], at 44:24–45:3 ("Q. Are these the only grievances that relate to the allegations in this lawsuit, sir, these two grievances? A. Yes.").)

[10] Mentions of Thomas's stool problems are fleeting in his First Amended Complaint, and he does not raise them at all in his brief in opposition to Defendants' motion for summary judgment [98] or in his Rule 56.1 Statement [100]. The only mentions of stool problems in Thomas's First Amended Complaint state: "Obaisi and Martija have prescribed stool softeners and suppositories, and Motrin for the plaintiff's pain. None of these medications has been effective in stopping the pain and bleeding, or otherwise alleviating plaintiff's condition of ill health." (First Am. Compl. [23] ¶ 25); and, "The defendant medical personnel ignored plaintiff's complaints, or otherwise made light of same, telling plaintiff that he would have to take the stool softeners, suppositories and Motrin 'for at least a couple years' before seeing any results. The doctors knew this was clearly false when they so advised plaintiff." (*Id.* at ¶ 26.)

December 2, 2014 stated that "Offender has been seen by the doctor for his hand. [Illegible] has been checked & is healing properly." (*Id.*)

Several months later, Wexford approved a request by Drs. Obaisi and Fritz to send Thomas to the University of Illinois Medical Center for an "ortho evaluation." (Stateville Med. Record [85-1], at Bates No. 285.) Per that referral, Thomas was eventually seen at UIC on November 12, 2015 by Dr. Alfonso Mejia. (UIC Records, Ex. G to Dfs.' SOF ("UIC Records") [85-3], at PageID # 1182; Pl.'s SOF [100] ¶ 10.) The record from that visit notes that Thomas experienced pain "with any activities requiring him to make a fist," that Thomas was "tender to palpitation . . . particularly over the metacarpals of the 4th and 5th dorsally," and that his "[r]ange of motion in the wrist [was] limited due to pain." (*Id.*) The doctor ordered "an EMG of the right hand," "therapy to work on range of motion and strengthening," for Thomas to "obtain a wrist brace to wear at night," and for him to "take vitamin B6 50mg daily." (*Id.*)

Thomas subsequently began physical therapy with Dr. Becerra in late 2015.[11] (*See* Stateville Med. Record [85], at Bates No. 207.) The chart notes are largely illegible from that session, except for an annotation that the staff member who made the note "suspect[ed] symptom magnification[,] [and believed that Thomas] may benefit from short term PT to [illegible]." (*Id.*) Thomas saw Becerra on December 4, 24, and 31 of 2015, and again on January 7, 2016. (*Id.* at Bates Nos. 208–10.) The parties agree that Dr. Becerra's chart notes state that Thomas mentioned a "pending lawsuit" about his "pt-issue" during his appointment, as well as mentioning "pending lawsuits against medical staff and other inmates." (Dfs.' Resp. to Pl.'s SOF [102] ¶¶ 17–18.)

---

[11] Plaintiff responds that he "cannot read and understand the medical records referred to" with respect to Dr. Becerra, but he "admits he was treated by Dr. Becerra at certain times." (Pl.'s Resp. to Dfs.' SOF [99] ¶ 48.) Whether or not Dr. Becerra was the attending physical therapist is irrelevant to the resolution of this case. The physical therapy medical notes appear on Thomas's Stateville medical chart, and the court assumes, though no party clarifies, that Dr. Becerra (or the attending physical therapist) is part of the Wexford medical team.

On January 14, 2016, Thomas's medical chart states "PT Note: NS for PT [illegible]." Defendants assert that this annotation (NS or "no show") means Plaintiff "did not appear for his" appointment. (Dfs.' SOF [84] ¶ 52.) The chart notes a "2nd NS" on January 20, and yet another on February 2. (Stateville Med. Record [85], at Bates Nos. 215–16.) Plaintiff, however, "denies failing to appear for any physical therapy for which he was notified and allowed to attend." (Pl.'s Resp. to Dfs.' SOF [99] ¶¶ 52, 53, 55, 57.) In the meantime, Thomas saw Dr. Martija again regarding his hand. Her January 22, 2016 chart notes state "R hand injury chronic." (Stateville Med. Record [85], at Bates No. 215.) She renewed a previously-granted lower-bunk permit "while awaiting ortho UIC consult," and she prescribed him "Tylenol PRN for pain." (*Id.*) It is unclear whether or when Thomas's physical therapy appointments with Dr. Becerra ended, but Dr. Becerra made another entry in Thomas' s PT medical record on March 13, 2017, this one largely illegible. (*See* Stateville Med. Record [85], at Bates No. 272.)

On May 25, 2016, Thomas returned to UIC for an EMG test, as ordered the prior November. (Pl.'s SOF [100] ¶ 12.) The results of that test were "'borderline abnormal,' . . . with findings 'suggestive of a right ulnar nerve mononeuropathy proximal to the wrist characterized by borderline sensorimotor demyelination but no evidence of axion loss.'" (Pl.'s SOF [100] ¶ 13 (citing UIC Records [85-3], at PageID # 1175).) He again saw Dr. Mejia of UIC on September 1, 2016. Dr. Mejia noted, after reading the EMG results, that "the only recommended intervention is occupational therapy" and that Thomas "voiced understanding and agreement of the treatment plan." (UIC Records [85-3], at PageID # 1180–81.) In his deposition, Thomas recalls that a UIC doctor told him that "if [my hand] would have been taken care of the first stage I wouldn't be having this [nerve] problem with my hand." (Thomas Dep. [85-2], at 75:1–3.)[12] He contradicts this

---

[12] Insofar as Thomas purports to be recounting what the UIC doctor told him, that statement is hearsay. FED. R. EVID. 803(4), excepts "[s]tatements made for purposes of medical diagnosis or treatment" from the realm of hearsay, but that does not include statements "made . . . by the person providing the medical attention to the patient." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 564 (7th Cir. 1996). If Thomas is simply recalling what he learned from that doctor, however, it is not hearsay and is admissible evidence.

statement in another part of his deposition, however: "Q. When [the UIC doctors] said [the nerve damage] was due to the injury to your hand, sir, did you have an understanding of whether that was due to the original breaking or due to the recovery after that? A. Well, due to the breaking. . . ." (Thomas Dep. [85-2], at 73:6–11.)

Thomas admits that he "has not suffered a physical injury" as a result of Wexford employees' treatment of his hand. (Pl.'s Resp. to Dfs.' SOF [99] ¶ 63.) He contends, however, that he "remains injured due to the failure to treat" his prior injury, that his hand "remains in pain, it swells, [and] it affects things as simple as his daily eating." (Pl.'s SOF [100] ¶ 19.) Plaintiff's brief in opposition to Defendants' motion for summary judgment summarizes his argument:

> [I]n short, T[homas's] main claim is that his hand fracture required recasting shortly after transferred [sic] to Stateville, that the required recasting admittedly never occurred, that his hand injury never successfully healed, x-rays have confirmed foreshortening of the heads of the 4th and 5th metacarpals, with angular deformation at the fracture sites. . . . [He] continues to have pain in the affected area. And that had he been properly recasted, his injuries would not have become permanent.

(Pl.'s Memo. in Opposition to Dfs.' MSJ [98], at 2–3 (emphasis in original).)

## II. Thomas's Prostate Problem

In addition to his hand pain, Thomas complains of Wexford's treatment of his prostate. Plaintiff Thomas has complained of urination frequency problems and an enlarged prostate since at least September 2007, when he was treated by Dr. Feinman at Menard Correctional Center.[13] (Dfs.' SOF [84] ¶ 22.) Feinman gave Thomas "medication for his prostate," which Thomas claimed was ineffective. (See Offender's Grievance, in Master File [84-1], at Bates No. 339.) Thomas "filed a grievance to see an outside specialist" in October 2007, but an Illinois Department of Corrections ("IDOC") Grievance Officer denied his grievance, finding that his "medical concerns [were] being addressed by the facility's healthcare staff." (Id. at Bates No. 338.)

---

[13] Dr. Feinman is not involved in this lawsuit. It appears that Thomas was incarcerated in Menard Correctional Center at the time. (See Master File [84-1], at PageID # 553.) No party claims that Dr. Feinman was employed by Defendant Wexford. The documents in the record refer to this doctor as "Dr. Feinerman." (See id. at PageID ## 554–55.)

Once at Stateville, Thomas continued to raise his prostate concerns with Wexford medical personnel. (*See, for example*, Stateville Med. Record [85], at Bates Nos. 41, 125, 132, 149, 196.) On December 21, 2011 an unidentified physician prescribed Thomas Flomax for his prostate. (Pl.'s Resp. to Dfs.' SOF [99] ¶ 31.) An ultrasound of Thomas's prostate several weeks later, in January 2012, appears to have turned up no prostate problem. (Stateville Med. Records, Ex. E to Dfs.' SOF [85-1], at Bates No. 505 ("X-ray findings: Normal Study.").) Notwithstanding the ultrasound, Thomas continued to see members of the healthcare unit at Stateville for medical attention for his prostate. (*See, for example*, Stateville Med. Record [85], Bates No. 132 (containing medical notes about Flomax and the prostate on Nov. 11, 2012).) The parties' statements of fact do not specify what complaints Thomas may have made, nor what treatments he may have received, for his prostate between 2012 and 2014.

On October 27, 2014, as noted above, Thomas filed a grievance requesting relief for his hand pain. The grievance also noted his prostate problem, and the Grievance Counselor's response explained that "[o]n 11-19-14, [the] HCU" (presumably, the healthcare unit) "took labs. Once results are in[,] he will be seen again by doctor per [illegible]." (Offender's Grievance, in Master File [84-1], at Bates No. 229.) Results from his November 19 lab tests show that most of Thomas's blood measures were normal—only his cholesterol, triglycerides, and LDL were high. (Stateville Med. Record [85-1], Bates Nos. 483–44.) Thomas's "BUN/Creat Ratio" and "MCHC" were low.[14] (*Id.*) Defendants do not specify what, if any, follow-up occurred after those results came back, and Plaintiff does not claim that these results revealed any prostate concerns.

---

[14] The court understands BUN/Creat ratio to refer to the ratio of blood urea nitrogen to creatinine in a patient's blood, and that a high measure can indicate a urinary obstruction or dehydration. *See Blood Urea Nitrogen*, MICHIGAN MEDICINE, https://www.uofmhealth.org/health-library/aa36271 (last visited Mar. 30, 2019). The court understands that MCHC to mean corpuscular hemoglobin concentration; abnormal results may indicate anemia. *RBC Indices*, UCSF Benioff Children's Hospital, https://www.ucsfbenioffchildrens.org/tests/003648.html (last visited Mar. 30, 2019).

Thomas filed another grievance against the healthcare unit on January 12, 2015. This time, he marked the nature of the grievance as "staff conduct" and "other: health care." (Offender's Grievance, in Master File [84-1], at Bates No. 220.) In that grievance, Thomas complained,

> I been put in to see a doctor about prostate problem and I have a serious medical. [sic] I suffer from stomach pain my stomach blowing up cause me now to bleed. The doctor no about this problem this medication conditions been going on to long. The medication they keep giving it not work. Refuses to send me out to see a doctor for my medical problem.

(*Id.* (containing only one page of the grievance); Exhibit to Complaint [6], at PageID # 49 (containing both pages of the grievance).) Thomas's requested relief was for the Grievance Counselor to "fix the problem." (Offender's Grievance, in Master File [84-1], at Bates No. 220.) The Grievance Counselor's January 20 response stated that the "grievance has been forwarded to the HCU for review and response . . . I/M [inmate] will receive a final response when the HCU responds." (*Id.*) Thomas then appealed that grievance to the Administrative Review Board. (Pl.'s Resp. to Dfs.' SOF [99] ¶ 17–18.) Thomas admits that the Board denied his appeal, but Thomas does not have the Board's response because "[i]t got lost due to a shakedown," and the court does not find it in the record. (*Id.* at ¶ 19; Thomas Dep. [85-2], at 50:18.)

Following the filing of this grievance, Thomas saw an unidentified medical professional. It appears that this appointment was for testing related to his prostate complaint on January 23, 2015, but the notes show Thomas "declined [a] residual urine test." (Stateville Med. Record [85], at Bates No. 185.) He is quoted in the chart notes as saying, "I don't want that catheter. I have some new medication & I want to see if it works." (*Id.*)[15] Plaintiff denies ever making that statement. (Pl.'s Resp. to Dfs.' SOF [99] ¶ 40.) A few months later, Thomas again saw a Stateville medical provider; there, he was assessed for, among other things, "BPH" (benign prostatic

---

[15] A later medical record note by Dr. Martija states that Thomas was in the care of Dr. Obaisi on January 23, 2015. (*See* Stateville Med. Record [85], at Bates No. 196.)

9

hyperplasia, or an enlarged prostate[16]). (Stateville Med. Record [85], at Bates No. 121.) The attending professional noted on the chart that Thomas refused a digital "[a]nus, [r]ectum" exam. (*Id.*) Under the "Plan" section of the chart notes, the provider wrote "discussed extensively the repercussions of the non-compliance & [illegible] testings." (*Id.*)

In May 2015, Thomas inquired with Dr. Martija about BPH medications. She noted that he had "[n]o prostate exam on record," that he had "refused DRE[17] at last physical," and that he "refused residual urine measurement by authorization c/o Dr. Obaisi 1/23/15." (Stateville Med. Record [85], at Bates No. 196.) Thus, she concluded that he had "no basis for BPH" and told Thomas "that if he has symptoms to make an appt w/ RNSC." (*Id.*)[18] This does not appear to be the first time Thomas had seen Dr. Martija; Thomas testified at his deposition that he recalled meeting with Dr. Martija about his prostate, but could not recall when. (*See* Pl.'s SOF [100] ¶ 21.) He did remember "telling her – I explain to her and Dr. Obaisi this is getting worse and worse." (Thomas Dep. [85-2], at 29:9–11.) He recalls her responding by increasing his Flomax prescription. (*Id.* at 30:16–22).

Thomas's medical records reflect another meeting with Martija on June 3, 2015. On his chart, Dr. Martija noted that Thomas's "prostate exam [was] deferred due to exam room not available," and she noted he should be scheduled "for [a] residual urine measurement." (Stateville Med. Record [85], at Bates No. 197.) Another note on the chart says "D/C [illegible] Flomax 0.8mg po QD." Defendants explain that this means his Flomax prescription was discontinued by Dr. Martija, apparently in preparation for a residual urine test. (Dfs.' SOF [84] ¶ 43.) That test took place on June 14, 2015. No notes in the medical record interpret the results, but they do say "16F

---

[16] *Benign prostatic hyperplasia (BPH)*, STEDMAN'S MED. DICT., Westlaw (database updated Nov. 2014).

[17] The court interprets DRE to refer to the digital rectal exam previously mentioned.

[18] Defendants interpret RNSC to mean "nursing sick call." (Dfs.' SOF [84] ¶ 42.) Plaintiff does not contest this interpretation.

catheter inserted using sterile technique. 10cc urine obtained approximately 5 minutes post-void." (Stateville Med. Record [85], at Bates No. 200.) Though Defendants claim this measure falls "within normal limits," neither party points to any evidence confirming this. Plaintiff denies that the result was normal but cites, as his support, only the facts that "Plaintiff is not a doctor and cannot interpret test results." (Pl.'s Resp. to Dfs.' SOF [99] ¶ 44.)

The parties' last mentions of Thomas's prostate problems come from early 2016, after this lawsuit was filed. Plaintiff admits that Wexford approved another prostate ultrasound on January 5, 2016. (Pl.'s Resp. to Dfs.' SOF [99] ¶ 51.) No party describes the outcome of that ultrasound. Thomas had more urine lab tests on March 21, 2016. The document listing the test results contains no interpretation or guidelines for interpretation, nor do the parties provide any. (*See* Stateville Med. Record [85-1], at Bates No. 501; Dfs.' SOF [84] ¶ 56.) At his deposition, Plaintiff Thomas admitted that he has not suffered "a physical injury as a result of his enlarged prostate." (Pl.'s Resp. to Dfs.' SOF [99] ¶ 62.) He contends, however, "that this action is premised on the failure to properly treat the existing condition or injury." (*Id.*)

## **DISCUSSION**

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is 'material' if it is one identified by the law as affecting the outcome of the case." *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 707 (7th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[I]f a reasonable factfinder could return a verdict in favor of" the non-movant based on those material facts, then Defendants' "motion must be denied." *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 536 (7th Cir. 2018). In reviewing Defendants' motion for summary judgment, the court must "view the facts . . . in the light most favorable to [Thomas][,] as the plaintiff and non-moving party." *Strand v. Minchuk*, 910 F.3d 909, 913 (7th Cir. 2018).

Here, Plaintiff brings his Eighth Amendment deliberate indifference claim against the two health care providers, Martija and Obaisi, and against Wexford pursuant to 42 U.S.C. § 1983. Section 1983 creates a private cause of action against any person who, acting under the color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." *Id.* To proceed against Wexford, this Circuit's precedent requires Plaintiff "to present evidence that a Wexford policy, practice, or custom caused [the alleged] constitutional violation." *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016).

The only constitutional violation Plaintiff has alleged is an Eighth Amendment deliberate indifference claim. "[T]he Eighth Amendment's proscription against cruel and unusual punishment [ ] impos[es] a duty upon the States, through the Fourteenth Amendment, 'to provide adequate medical care to incarcerated individuals.'" *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (quoting *Boyce v. Moore*, 314 F.3d 884, 888–89 (7th Cir. 2002)). "To determine if the Eighth Amendment has been violated in the prison medical context, [the court must] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016). Deliberate indifference is a "subjective standard" requiring defendants to have "know[n] of the serious risk to the prisoner's health . . . and they must [have] also consciously disregard[ed] that risk/need so as to inflict cruel and unusual punishment on the prisoner." *Johnson*, 433 F.3d at 1010 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994)). The Seventh Circuit has described deliberate indifference as "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

Assuming, without deciding, that Thomas's hand pain and prostate issues constituted objectively serious medical conditions, the evidence is insufficient to establish that neither of the individual Defendants was deliberately indifferent to Thomas's medical needs. Plaintiff was seen

12

multiple times by multiple Wexford healthcare professionals for both his hand pain and his prostate concerns. For his hand, he received multiple x-rays, multiple therapy sessions, pain medication, and an outside orthopedic specialist referral. He complains that he was not given a cast when he entered Stateville, but a Stateville PA read his prior x-rays and determined that "no further treatment [was] needed." (Stateville Med. Record [85], at Bates No. 40.) *See Zackery v. Mesrobian*, 299 F. App'x 598, 601 (7th Cir. 2008) ("[D]issatisfaction with a doctor's chosen course of treatment—even when that course was negligent—is insufficient to establish deliberate indifference.") Thomas received physical therapy in both 2012 and 2015–16. And, even if a UIC doctor later told Thomas that proper treatment of his hand at "the first stage" would have prevented nerve damage (Thomas Dep. [85-2] 75:1–3), that doctor's own retrospective assessment is not sufficient to allow a reasonable jury to conclude that a PA had previously failed to exercise his or her professional judgment in reading Thomas's x-rays and in determining that no further hand treatment was needed. *See Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) ("A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if 'the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'") (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir.1998)).

The court recognizes that Thomas continued to experience hand pain for several years, but the fact that he disagrees with how Wexford employees managed that pain is not enough to establish deliberate indifference. In a similar case, the Seventh Circuit affirmed a district court's grant of summary judgment for a defendant-doctor, whom a plaintiff-inmate claimed violated his Eighth Amendment rights. *Zackery v. Mesrobian*, 299 F. App'x 598, 599 (7th Cir. 2008). Inmate Zackery there injured his knee playing basketball, and a doctor who saw him four days later "concluded that there was nothing wrong with his knee." *Id.* at 599. The defendant doctor saw him several times following the injury and ignored an outside orthopedist's recommendation that

13

Zackery have an MRI or an arthroscopic examination. The doctor "eventually diagnos[ed] Zackery with osteoarthritis and prescribe[ed] medication for that illness." *Id.* at 600. For the next four years, the plaintiff continued to complain about knee pain. The defendant "examined Zackery approximately twenty times; referred him to specialists; ordered x-rays; tried multiple treatments including medication, physical therapy, and bedrest; and eventually sent him to see experts at the University of Illinois." *Id.* at 601. When he was eventually referred to UIC, Zackery was diagnosed with "torn menisci" and underwent surgery. *Id.* at 599. The Seventh Circuit still concluded that, "[i]n light of the totality of care [the defendant] provided, a reasonable fact-finder could not construe his actions as deliberate indifference." *Id.* at 601. As in *Zackery*, no reasonable trier of fact here could conclude that Wexford employees acted with deliberate indifference to Thomas's hand pain.

Nor could a reasonable jury conclude that Wexford employees were deliberately indifferent to Thomas's prostate concerns. Again, Thomas takes issue with the decisions that Wexford employees took in the course of treatment. The record shows that he was continually proscribed prostate medication, that he was offered multiple prostate screenings—some of which he accepted and some of which he refused, and that he was sent for at least two prostate ultrasounds over the course of five years. *See Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) (recognizing "the deference owed to the professional judgment of medical personnel" in the deliberate indifference case context). Here, Thomas does not argue that he was mis-diagnosed, that Wexford staff ignored outside specialists' recommendations for treatment, or that the medical unit's care (or lack thereof) resulted in some new harm. Thus, "[w]hat we have here is not deliberate indifference to a serious medical need, but a deliberate decision by a doctor to treat a medical need in a particular manner." *Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008). Simply disagreeing with a course of treatment is not enough to allow a reasonable jury to conclude that Wexford employees were deliberately indifferent to Thomas's prostate condition.

Even if Plaintiff Thomas had evidence of indifference on the part of Wexford's employees, his claim against Wexford would, on this record, fail. Plaintiff Thomas would need to establish that Wexford had a policy, practice, or custom of deliberate indifference by presenting evidence of "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) . . . [alleging] that the constitutional injury was caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (quoting *Estate of Sims*, 506 F.3d at 515). That policy or custom "must be the 'direct cause' or 'moving force' behind the constitutional violation." *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (quoting *Estate of Novack ex rel. v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000)).[19]

Plaintiff admits that he has no evidence of a formal Wexford policy causing deliberate indifference to his medical needs, nor does he note any express policy in his Rule 56.1 statement or his briefing. (Pl.'s Resp. to Dfs.' SOF [99] ¶ 64.) Plaintiff also fails to assert that any person with final policymaking authority caused his injury. Instead, he argues that Wexford has a policy or "custom of deliberate indifference that arises from the known or obvious consequences in its practices." (First Am. Compl. [23] ¶ 45.) The court interprets this to be an argument that Wexford has a "widespread practice that is so permanent and well-settled that it constitutes a custom or practice." *Spiegel*, 916 F.3d at 617.

As Wexford has argued, in circumstances like these, where Plaintiff has not established any underlying constitutional violation, his claim against Wexford must be dismissed as well. *See Petty v. City of Chicago*, 754 F.3d 416, 424–25 (7th Cir. 2014) ("It is well established that there can be no municipal liability based on an official policy under *Monell* if the policy did not result in

---

[19] The fact that no individual Defendants remain in this suit does not, in and of itself, prevent Thomas from bringing a *Monell* claim against Wexford. *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir.), *cert. denied sub nom. Corr. Med. Servs., Inc. v. Glisson*, 138 S. Ct. 109, 199 L. Ed. 2d 30 (2017) ("[I]f institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible.").

a violation of [a plaintiff's] constitutional rights.") (quoting *Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008)). Without establishing an underlying deliberate indifference claim, Thomas's *Monell* claim against Wexford necessarily fails.[20]

## **CONCLUSION**

The record shows that Plaintiff Thomas was seen by medical professionals on several occasions, and received tests, treatments, and therapy for his previous hand fracture and his prostate issues. Now represented by counsel, Thomas has not presented evidence from which a reasonable jury could conclude that Wexford's employees were deliberately indifferent to his serious medical needs. Lacking any underlying constitutional injury, Thomas's § 1983 claim against Wexford fails. Defendants' motion for summary judgment [83] is granted.

ENTER:

Dated:     March 30, 2019

_____
REBECCA R. PALLMEYER
United States District Judge

---

[20] Even if Plaintiff's underlying constitutional claim survived, Plaintiff has not raised any genuine issues of material fact regarding Wexford's policies and customs, and no reasonable trier of fact could conclude on the undisputed facts that Wexford had a widespread practice of deliberate indifference to inmates' serious medical needs.